# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>DAVID STONEBROOK,<br><br>Plaintiff and Relator,<br><br>v.<br><br>MERCK KGaA, DARMSTADT, GERMANY;<br>SIGMA-ALDRICH CORP.; EMD<br>MILLIPORE; RESEARCH ORGANICS, LLC,<br><br>Defendants. | Case No. 21-cv-10866-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                              **March 15, 2024**

## I.    Introduction

This case began as a relator action, but the government declined to intervene.  D. 22.  The relator, Plaintiff David Stonebrook ("Stonebrook"), now pursues this lawsuit against Defendants Merck KGaA, Darmstadt, Germany ("MKDG"), Sigma-Aldrich Corp., EMD Millipore and Research Organics, LLC (collectively, "Defendants"), alleging that Defendants caused Pfizer and Moderna to submit false claims to the government in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) (Counts I–III).  D. 70 ¶¶ 111–24.  Stonebrook also alleges that Defendants retaliated against him in violation of the FCA, § 3730(h) (Count IV).  Id. ¶¶ 125–27.  Defendants have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), D. 84.  Defendants have also moved to dismiss the amended complaint as to MKDG

1

pursuant to Rule 12(b)(5).  Id.  For the reasons stated below, the Court ALLOWS Defendants'
motion to dismiss.

## II.     Standards of Review

### A.     Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with
particularity the circumstances constituting fraud or mistake."  The purpose of Rule 9(b) is "to
give notice to defendants of the plaintiffs' [fraud] claim, to protect defendants whose reputation
may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing
of suits that simply hope to uncover the relevant information during discovery."  Doyle v. Hasbro,
Inc., 103 F.3d 186, 194 (1st Cir. 1996) (internal citation omitted).

A relator in a _qui tam_ action "who sues under the FCA must plead fraud with particularity."
United States ex rel. Ciaschini v. Ahold USA Inc., 282 F.R.D. 27, 33 (D. Mass. 2012); see United
States ex rel. Karvelas v. Melrose–Wakefield Hospital, 360 F.3d 220, 227–28 (1st Cir. 2004),
abrogation on other grounds recognized by Lestage v. Coloplast Corp., 982 F.3d 37, 46 (1st Cir.
2020).  Accordingly, the relator must allege the "time, place, and content of an alleged false
representation," United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009)
(internal citation and quotation marks omitted), i.e., the "who, what, when, where, and how of the
alleged fraud."  Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 31 (1st Cir. 2016)
(quoting United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 124 (1st Cir. 2013)).
"Conclusory allegations . . . are not sufficient  to satisfy Rule 9(b)."  Gagne, 565 F.3d at 45
(internal quotation marks and citation omitted).  A claim of fraud made "'on information and
belief' allegations remain[s] subject to the particularity requirements of Rule 9(b)."  Karvelas, 360
F.3d at 226 (quoting New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 288 (1st Cir. 1987)).

To meet this pleading standard, the First Circuit has noted that "a relator must provide details that identify particular false claims for payment that were submitted to the government." Ge, 737 F.3d at 123 (quoting Karvelas, 360 F.3d at 232).  These "details" include—and are not limited to—"the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." Id. at 232–33 (quoting Karvelas, 360 F.3d at 233).  Although there is no "checklist of mandatory requirements," Rule 9(b) requires that a relator plead "some of this information for at least some of the claims."  Karvelas, 360 F.3d at 23 (citation omitted).

Where "the defendant is alleged to have induced third parties to file false claims," Hagerty, 844 F.3d at 31, a relator may satisfy Rule 9(b) by "providing factual or statistical evidence to strengthen the inference of fraud beyond possibility, without necessarily providing details as to each false claim."  Ge, 737 F.3d at 123–24 (internal quotation marks and citation omitted).  "Such evidence must pair the details of the scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted.'"  United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d 29, 39 (1st Cir. 2017) (quoting United States ex rel. Duxbury v. Ortho Biotech Products, L.P., 579 F.3d 13, 29 (1st Cir. 2009)).

### B.    Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct

a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir.

2013).   First, the Court must perform a close reading of the claim to distinguish the factual

allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must

be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the

Court must determine whether the factual allegations present a "reasonable inference that the

defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir.

2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the

Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (quoting Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009)).

## III.   Factual Background

The following facts are alleged in Stonebrook's amended complaint, D. 70, and taken as

true for purposes of considering Defendants' motion to dismiss.

From January 4, 2021 to March 3, 2021, Defendant Research Organics, LLC, a subsidiary

of Defendant EMD Millipore, employed Stonebrook as a GMP Packaging Supervisor at a facility

in Cleveland, Ohio, where pharmaceutical components were manufactured and packaged (the

"Facility").   Id.  ¶¶ 11–12.   Stonebrook's responsibilities included, inter alia, "supervising

packaging operations to ensure adherence with safety and quality requirements," "performing

audits of packaging areas," "[m]aintain[ing] constant improvements in packaging quality

products," and "following [G]ood [M]anufacturing [P]ractices (GMP)."[1]  Id. ¶¶ 12, 14.

Stonebrook alleges that the Facility manufactured and packaged products for use in Covid-

19 vaccines.  Id. ¶ 17.  He alleges that, prior to his employment, he interviewed with individuals

---

[1]  Good Manufacturing Practices, or "GMPs," are standards set forth in regulations
promulgated by the Food and Drug Administration ("FDA") governing the manufacture of
pharmaceutical components.  See generally 21 C.F.R. Part 211.

in managerial positions at the Facility, who repeatedly noted this use of its products.  Id. ¶¶ 15–
17.  Once Stonebrook started at the Facility on January 4, 2021, he allegedly learned that it was
"common knowledge" among employees that the Facility was supplying two products to Pfizer
and Moderna for use in their Covid-19 vaccines:  TRIS and HEPES.[2]  Id. ¶ 18–19.  Management
at the Facility reiterated the same to employees at daily management meetings.  Id. ¶¶ 19–21.
During these meetings, managers would often announce certain TRIS and HEPES orders as
"Covid hot," "Covid rated," or "rated Covid" to indicate they had to be packaged and shipped as
soon as possible.  Id. ¶ 21; see ¶¶ 23–24.

     Stonebrook further alleges that Pfizer and Moderna were producing Covid-19 vaccines
pursuant to contracts with the government.  Id. ¶¶ 29–30.  Specifically, the amended complaint
incorporates by reference four contracts which have been published on government websites, id.,
including two Pfizer contracts and two Moderna contracts.  Id. ¶¶ 29 n.11, 30 n.12.   The Army
Contracting Command ("Army"), on behalf of the government, issued two contracts to Pfizer, one
"to demonstrate that Pfizer has the business and logistics capability to manufacture 100M doses
of its currently unapproved mRNA-based COVID-19 vaccine for the Government," Dep't of the
Army, Statement of Work for Covid-19 Pandemic-Large Scale Vaccine Manufacturing

---

[2] TRIS is a compound which includes or is otherwise known as "Tromethamine," "TRIS
Hydrochloride," "TRIS HCL," "Tris(hydroxymethyl)aminomethane," "2-Amino-2-
(hydroxymethyl)-1,3-propanediol," "BIS-TRIS Hydrochloride," "BIS-TRIS," "BIS-TRIS
Propane."  D. 70 ¶ 19 n.1.  TRIS functions as a "buffering agent that is used to adjust or stabilize
the pH balance of a solution and is frequently utilized as a buffer and excipient in biological
products such as vaccines."  Id.

     HEPES is a compound which includes and is otherwise known as "HEPES, Hemisodium
Salt," "HEPES, Sodium Salt," "Hydroxyethylpiperazine ethane sulfonic acid," "4-(2-
Hydroxyethyl)piperazine-1-ethanesulfonic acid," "N-(2-Hydroxyethyl)piperazine-N'-(2-
ethanesulfonic acid)."  Id. ¶ 19 n.2.  HEPES functions as a "zwitterionic sulfonic acid buffering
agent, that is used to maintain enzyme structure and help the enzyme function at low
temperatures."  Id.

Demonstration 2 (July 21, 2020), https://perma.cc/U3AX-YG9D ["Pfizer-Army Contract #1"],
and the other to facilitate the purchase of 500 million doses of vaccines by the Department of
Health and Human Services ("HHS"), "enough to vaccinate the entire American population."
Dep't of the Army, Production of COVID-19 BNT162b2 Vaccine in Support of National
Emergency Response to Coronavirus 2019 (COVID-19) 26 (December 22, 2020),
https://perma.cc/LXG6-EBQE ["Pfizer-Army Contract #2"].   As to Moderna, HHS issued a
contract for the development of a Covid-19 vaccine and for Moderna to demonstrate its capacity
to produce 100 million doses by 2021, Dep't of Health & Hum. Servs., Contract No.
75A50120C00034 Development of an mRNA Vaccine for SARS-CoV-2 4 (Apr. 16, 2020),
https://perma.cc/RZV9-UPD9 ["Moderna-HHS Contract"], and the Department of Defense
("DoD") issued a contract for the manufacture of 500 million doses of the Covid-19 vaccine.  Dep't
of Def., Statement of Work Large Scale Production of SARS-CoV-2 Vaccine 2 (Sept. 8, 2020),
https://perma.cc/BP7P-E2JQ ["Moderna-DoD Contract"].   According to Stonebrook, these
contracts required Pfizer and Moderna to produce Covid-19 vaccines, and any components used
in same, in a manner compliant with GMP regulations.  D. 70 ¶¶ 29–31.

Stonebrook alleges that once he started working at the Facility, he observed that conditions
there did not comply with GMP regulations.  Id. ¶ 38.  Specifically, Stonebrook asserts that the
Facility's air filtration and dust collection systems were "unsanitary" and "mold-infested."  Id.
¶¶ 38–39.  Citing his experience at comparable facilities, Stonebrook alleges that the Facility's air
filtration system was outdated and overtaxed and, as a result, would recycle contaminated air
throughout packaging rooms.  Id. ¶¶ 41–42.  Pharmaceutical components were unloaded from
large containers and repackaged into smaller containers in these rooms and, thus, were allegedly
exposed to contaminated air for extended periods.  Id. ¶ 43.  In addition, Stonebrook alleges that

the ductwork leading to the room where TRIS and HEPES were packaged contained mold growth and buildup of residual drug product.  Id. ¶¶ 44, 45.  Stonebrook further alleges that Facility staff likely exacerbated mold growth by spraying down the packaging rooms and equipment with water. Id. ¶¶ 46–49.

Stonebrook asserts that Facility staff took steps to hide unsanitary conditions from customers during audits for GMP compliance, although he does not allege that these audits were conducted by Pfizer or Moderna.  Id. ¶¶ 51–55.  During site visits, the Facility Quality Manager allegedly would steer auditors away from areas of the Facility with mold and instructed Stonebrook to avoid packaging rooms.  Id. ¶ 53.  For example, on or about January 20 to 22, 2021, one of Defendants' customers conducted a virtual site visit of the Facility to assess GMP compliance, and Stonebrook allegedly saw the Facility Quality Manager point the camera to the ground to prevent inspectors from seeing the mold-infested air filtration system.  Id. ¶ 54; see id. ¶ 44.

As alleged, Stonebrook grew concerned that the contamination of TRIS and HEPES at the Facility would compromise the safety of the Covid-19 vaccines produced by Pfizer and Moderna. Id. ¶¶ 58, 61.  In January 2021, Stonebrook reported the alleged unsanitary conditions and GMP noncompliance to his immediate supervisor, who ignored his concerns.  Id. ¶ 62.  On February 5, 2021, Stonebrook emailed the Facility Site Director, as well as executives at Defendants EMD Millipore and MKDG, about his concerns regarding the alleged GMP violations at the Facility. Id. ¶¶ 63–64.  On the same day, Stonebrook submitted a report through Defendants' "Speak Up" system, an internal compliance system through which employees are able to report possible regulatory violations.  Id. ¶ 66.  Stonebrook related in that report that he had told the Facility Site Director "that conditions at the site have caused impure and potentially unsafe products to reach interstate commerce."  Id.   Stonebrook also recommended steps to prevent any further

contamination, explained that his prior recommendations had been ignored, and asserted that any labeling of products as "[m]anufactured under appropriate GMP controls" was "indisputably false" and that "[t]he conditions in Cleveland are a risk to patient safety."  Id. ¶¶ 68–70.  On February 6, 2021, Stonebrook forwarded the February 5 "Speak Up" report, via email, to the same group of individuals he had emailed the previous day.  Id. ¶ 71.

On February 8, 2021, Stonebrook again emailed a group of Defendants' executives about the conditions at the Facility.  Id. ¶ 72.  Several days later, on February 11, 2021, MKDG's Senior Vice President Dieter Hofner called Stonebrook and was joined over phone by Melissa Reed, Head of Employee Relations.  Id. ¶ 73.  As alleged, Stonebrook expressed to Hofner and Reed that the Facility was not fit to package pharmaceutical components for vaccines.  Id.  Hofner acknowledged that the Facility needed improvements, capital investment, and clear procedures and reassured Stonebrook that he would have Defendants' full support in ensuring same.  Id.

On February 23, 2021, Stonebrook called the Food and Drug Administration ("FDA") to report the conditions at the Facility and spoke with FDA representatives regarding his concerns. Id. ¶ 75.  Two days later, on February 25, 2021, Stonebrook told Reed that Defendants "had a legal and moral duty to ensure patient safety" and that "he was committed to helping Defendants bring their operations into compliance to ensure safe pharmaceutical components reached the market." Id. ¶ 76.  On February 28, 2021, Stonebrook submitted another "Speak Up" report asserting that the Facility's conditions violated the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, and that he had previously referenced these purported violations in communications with Hofner.  Id. ¶ 77. On the same day, Stonebrook was placed on administrative leave.  Id. ¶ 80.  On March 3, 2021, Stonebrook emailed EMD Millipore Head of Quality Operations to schedule a meeting to discuss the Facility's GMP compliance; in the email, Stonebrook also expressed concerns as to being

placed on leave.  Id. ¶¶ 78–79.  On the same day, Hofner and Reed held a videoconference meeting with Stonebrook and terminated him from his employment.  Id. ¶ 81.

## IV.    Statutory and Regulatory Background

The Federal Food, Drug, and Cosmetic Act ("FDCA") and FDA regulations provide health and safety standards for the manufacture and packaging of drugs.  The FDCA defines "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" or "articles intended for use as a component" of same.  21 U.S.C. § 321.  A drug is "adulterated" if "it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health" or if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . ."  21 U.S.C. § 351(a)(2)(A)–(B).

The regulatory standards for good manufacturing practice, or GMPs, are established by the FDA.  See 21 C.F.R. § 211.80.  These regulations require, inter alia, that "[c]omponents and drug product containers and closures shall at all times be handled and stored in a manner to prevent contamination."  21 C.F.R. § 211.80.  "Each lot of a component, drug product container, or closure that is liable to contamination with filth . . . or other extraneous adulterant shall be examined against established specifications for such contamination."  21 C.F.R. § 211.84(d)(5).  "Each lot of a component, drug product container, or closure with potential for microbiological contamination that is objectionable in view of its intended use shall be subjected to microbiological tests before use."  21 C.F.R. § 211.84(d)(6).  Regulations define a "component" broadly to mean "any ingredient intended for use in the manufacturing of a drug product, including those that may not appear in such drug product."  21 C.F.R. § 210.3(b)(3).

Relatedly, the FDCA deems a drug "misbranded" if "its labeling is false or misleading." 21 U.S.C. § 352(a)(1). Labeling refers to "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). "If an article is alleged to be misbranded . . . , then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in light of such representations or material with respect to consequences which may result from the use of the article to which the labeling . . . relates under the conditions of use prescribed in the labeling . . . thereof or under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

## V.    Procedural History

Under the FCA, either the Attorney General or a private party may pursue a lawsuit alleging fraud on the government. 31 U.S.C. § 3730(a)–(b). "A private enforcement action under the FCA is called a *qui tam* action, with the private party referred to as the 'relator.'" United States ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (quoting Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 769 (2000)). "Qui tam complaints are initially filed under seal, and relators must allow the government sixty days to intervene and assume primary responsibility for prosecuting the action." United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 719 F.3d 31, 33 (1st Cir. 2013) (citing 31 U.S.C. § 3730(b)(2)–(3), (c)). "If the United States declines to intervene, the relator may pursue the action on its behalf." Id.

Stonebrook instituted this *qui tam* action on May 25, 2021 as a relator. D. 1. Following "review and consideration" of Stonebrook's allegations, the United States declined to intervene

and filed notice of same on July 26, 2022.  D. 22 at 1.  New counsel for Stonebrook filed a notice of appearance on January 9, 2023, and shortly thereafter,  Stonebrook served the complaint upon Defendants MKDG, Sigma-Aldrich Corp. and EMD Millipore and Research Organics, LLC. D. 31; D. 32; D. 33; D. 34.  Stonebrook filed an amended complaint on March 7, 2023.  D. 70. Defendants now have moved to dismiss the amended complaint.  D. 84.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 120.

## VI.    Discussion

Defendants argue that the amended complaint should be dismissed because Stonebrook has failed to plead the submission of false claims with particularity under Rule 9(b), D. 85 at 13–28, and failed to state a claim under Rule 12(b)(6).  Id. at 28–38.  Defendants also argue that the amended complaint should be dismissed as to MKDG for insufficient service of process under Rule 12(b)(5).  Id. at 38–41.

### A.    Stonebrook Has Not Pled Fraud with Particularity Under Rule 9(b)

As noted above, a relator in a *qui tam* action "who sues under the FCA must plead fraud with particularity."  Ciaschini, 282 F.R.D. at 33.  Rule 9(b) typically requires a relator to allege the details of actual false claims submitted to the government.  Ge, 737 F.3d at 123; see Gagne, 565 F.3d at 45.  Where, as here, Defendants are "alleged to have induced third parties to file false claims," Hagerty, 844 F.3d at 31, Stonebrook may "provid[e] 'factual or statistical evidence to strengthen the inference of fraud beyond possibility,' without necessarily providing details as to each false claim."  Ge, 737 F.3d at 123–24 (quoting Duxbury, 579 F.3d at 29).  "Such evidence must pair the details of the [fraudulent] scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted.'"  Nargol, 865 F.3d at 39 (quoting Duxbury, 579 F.3d at 29).

For example, in Duxbury, 579 F.3d at 29, a relator alleged that defendant Ortho Biotech Products, L.P. ("OBP") used illegal kickbacks to cause medical providers to submit false claims to the Medicare Program through reimbursement of drug prescriptions.  The First Circuit held that, "[a]lthough a close call," the relator's allegations satisfied Rule 9(b) because the relator "identified, as to each of the eight medical providers (the who), the illegal kickbacks (the what), the rough time periods and locations (the where and when), and the filing of false claims themselves."  Id. at 30. The First Circuit highlighted allegations that, from 1997 to 1998, one particular provider received more than $5,000 worth of drug product so that it could submit the free product for reimbursement to Medicare and allegations that another provider submitted "approximately 4,800 claims a month for Medicare reimbursement" based on OBP's unlawful kickbacks.  Id.

Nargol, 865 F.3d at 37–41, is also illustrative of the particularity required where the inducement of false claims has been alleged.  There, relators alleged that Depuy Orthopaedics, Inc. ("DePuy") caused the submission of false claims by selling materially defective versions of their FDA-approved devices to Medicare and Medicaid patients, whose doctors then sought reimbursement for same.  Id. at 37, 41.  The First Circuit held that relators sufficiently paired "the details of a fraudulent scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted'" to the government.  Id. at 41 (quoting Duxbury, 589 F.3d at 29).  The First Circuit emphasized that, in addition to demonstrating that the devices had "materially deviated from the approved [FDA] specifications in a manner that materially increased the risk of patient harm," id. at 40, relators had alleged that "over a five-year period, several thousand Medicare and Medicaid recipients received what their doctors understood to be Pinnacle MoM device implants; that more than half of those implants fell outside the specifications approved by the FDA; and that the latency of the defect was such that doctors would have had no reason not to submit claims for

reimbursement for noncompliant devices." <u>Id.</u> at 41.  Accordingly, the First Circuit concluded that the relators had "allege[d] facts showing that it [was] statistically certain that DePuy caused third parties to submit many false claims to the government." <u>Id.</u>

By contrast, in <u>Hagerty</u>, 844 F.3d at 32, the First Circuit affirmed the dismissal of an amended complaint because it failed to connect "factual and statistical evidence . . . with the submission of any false claims to government programs."  The relator had alleged that Cyberonics, Inc. engaged in a fraudulent scheme to encourage doctors and patients to prematurely and unnecessarily replace batteries in medical devices used for the treatment of refractory epilepsy. <u>Id.</u> at 29–30.  The First Circuit noted that, although the relator had identified specific healthcare providers, the complaint "d[id] not allege whether these providers submitted reimbursement claims to the government for unreasonable and medically unnecessary procedures" or "how many false claims these providers purportedly submitted" or "how Cyberonics' actions caused their submission." <u>Id.</u> at 32.

Here, Stonebrook's allegations of fraud fall short of the particularity required under Rule 9(b).  As to "who" allegedly submitted false claims, Stonebrook alleges that Pfizer and Moderna falsely certified GMP compliance of their vaccines to the government but does not allege by whom at these companies.  Stonebrook also does not allege rough time periods "when" or "where" false claims were submitted, unlike the relators in <u>Duxbury</u>, 579 F.3d at 30, and in <u>Nargol</u>, 865 F.3d at 41 & n.7.

Beyond the "who," "when," and "where" of the alleged fraud, the allegations in the amended complaint are lacking as to the "what" and "how" of the fraud.  Stonebrook alleges that HEPES and TRIS were manufactured and packaged at the Facility in noncompliance with GMP regulations, that Defendants then falsely certified GMP compliance to Pfizer and Moderna as to

the HEPES and TRIS from the Facility, and that this caused Pfizer and Moderna to falsely certify to the government that their respective Covid-19 vaccines were GMP compliant.[3]

Assuming *arguendo* that Stonebrook has adequately alleged GMP violations at the Facility, it does not "necessarily follow[ ] that false claims and/or material  false information were filed." United States ex rel. D'Agostino v. EV3, Inc., 153 F. Supp. 3d 519, 533 (D. Mass. 2015) (quoting Ge, 737 F.3d at 124) (emphasizing that such a *per se* rule would violate the specificity requirements of Rule 9(b)).  "Because FCA liability attaches only to false *claims*, merely alleging facts related to a defendant's alleged *misconduct* is not enough."  Ge, 737 F.3d at 124 (emphasis in original) (internal citations omitted).

Stonebrook also does not allege with specificity how Pfizer and Moderna were misled into including adulterated drugs in their vaccines.  He alleges "[u]pon information and belief" that "Defendants told or led Pfizer and Moderna to believe that the TRIS and HEPES products purchased from them were GMP compliant."  D. 70 ¶ 32.  However, "allegations of fraud made

---

[3] Defendants dispute Stonebrook's factual allegations that TRIS and HEPES packaged at the Facility were used in the Covid-19 vaccines produced by Pfizer and Moderna.  See D. 85 at 14–18; D. 95 at 5–7.  Specifically, Defendants point to briefing documents by the FDA Vaccines and Related Biological Products Advisory Committee and reports by the European Medicines Agency ("EMA") to assert that TRIS and HEPES were not ingredients in the original formulation of the Pfizer Covid-19 vaccine, D. 85 at 15–17, and that HEPES was not an ingredient in the original formulation of the Moderna Covid-19 vaccines.  Id. at 17.  Defendants also dispute whether TRIS packaged at the Facility was supplied to Moderna for the Covid-19 vaccine.  Id. at 17–18.  Stonebrook responds by noting that Defendants cite documents not referenced in the amended complaint and that other allegations beyond the FDA and EMA documents support the conclusion that TRIS and HEPES manufactured and packaged at the Facility were used in the Pfizer and Moderna vaccines. D. 89 at 19–24.  For the purpose of resolving this motion to dismiss, the Court assumes, as it must at this juncture, the truth of Stonebrook's allegations that TRIS and HEPES were packaged at the Facility and sent to Pfizer and Moderna.  See, e.g., D. 70 ¶¶ 19, 20. Stonebrook, however, has still failed to allege plausibly, as discussed below, that Defendants made any false representations to Pfizer or Moderna about GMP requirements of their pharmaceutical components or that the GMP requirements allegedly referenced in the manufacturers' contracts mandated GMP compliance for the TRIS and HEPES manufactured and packaged at the Facility.

on information and belief are [ ] subject to the additional requirement that 'the complaint set[ ] forth the facts on which the belief is founded.'" Karvelas, 360 F.3d at 226 (quoting New Eng. Data Servs., Inc., 829 F.2d at 288). No such supportive facts are set forth in the amended complaint.

The amended complaint also is devoid of any specifics as to "how many false claims" were submitted to the government. See Hagerty, 844 F.3d at 32. Stonebrook's allegations do not provide even a rough estimate of how many vaccines allegedly contained adulterated HEPES or TRIS or how much Pfizer and Moderna sought in payment for allegedly false claims. Stonebrook also does not any statistical likelihood that the alleged GMP noncompliance actually led to the submission of claims for same. See D'Agostino, 153 F. Supp. 3d at 538.

In sum, Stonebrook's allegations are lacking as to the "who," "what," "where," "when" and "how" of the alleged submission of false claims by Pfizer and Moderna, and the amended complaint fails to pair the details of GMP noncompliance at the facility with "reliability indicia that lead to a strong inference that [false] claims were actually submitted." See Nargol, 865 F.3d at 39. Because Stonebrook has not pled fraud with the requisite particularity under Rule 9(b), Counts I, II and III—which are all based upon this theory of fraud—must be dismissed.

**B.      Stonebrook Has Failed to State a Plausible FCA Claim Under Rule 12(b)(6)**

Defendants also argue that Stonebrook has failed to state an FCA claim under 31 U.S.C. § 3729(a)(1) and so the amended complaint should be dismissed on this basis pursuant to Rule 12(b)(6). The amended complaint alleges violations of the FCA's presentment clause (Count I) and false records clause (Count II). 31 U.S.C. § 3729(a)(1)(A)–(B). Stonebrook also alleges "reverse false claims" stemming from Defendants' alleged avoidance of an obligation to pay the government (Count III). 31 U.S.C. § 3729(a)(1)(G).

1.     *FCA Violations Pursuant to 31 U.S.C. § 3729(a)(1)(A) and (B) (Counts I and II)*

The presentment clause imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  The false records clause imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  To state a claim under either clause, a relator plausibly must allege that the defendant (1) made claims or statements; (2) that these claims or statements were false; and (3) made with the requisite scienter.  United States ex rel. Mackillop v. Grand Canyon Educ., Inc., 626 F. Supp. 3d 418, 444 (D. Mass. 2022) (citing Karvelas, 360 F.3d at 225).  The misrepresentation also must be "material to the Government's payment decision in order to be actionable under the False Claims Act."  United Health Servs. v. United States ex rel. Escobar, 579 U.S. 176, 181 (2016).  Defendants argue that the amended complaint has not plausibly alleged the falsity of claims, materiality and knowledge.  See D. 85 at 29–33.

a)     Falsity

"An actual false claim is the "*sine qua non* of a False Claims Act violation."  United States ex rel. Booker v. Pfizer, Inc., 9 F. Supp. 3d 34, 50 (D. Mass. 2014) (quoting Karvelas, 360 F.3d at 225).  Stonebrook's theory of falsity, as alleged, is based upon Pfizer and Moderna's "implied false certification" of GMP compliance when seeking payment for Covid-19 vaccines pursuant to four government contracts.  D. 70 ¶¶ 34, 37.

In Escobar, 579 U.S. at 186, the Supreme Court held that "the implied false certification theory can, at least in some circumstances, provide a basis for liability."  The Court reasoned that although the FCA does not define what makes a claim "false" or "fraudulent," "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-

16

settled meaning of the common-law terms it uses." Id. at 187.  The Court then observed that common-law fraud "has long encompassed certain misrepresentations by omission" and emphasized that "representations that state the truth only so far as it goes, while omitting critical qualifying information [ ] can be actionable misrepresentations." Id. at 187–88.  Accordingly, the Court held that implied false certification can be a basis for FCA liability "at least where two conditions are satisfied:  first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Id. at 190.

Despite Stonebrook's conclusory allegations that Pfizer and Moderna submitted false claims "by way of implied certification of compliance with GMP requirements delineated in the US-Pfizer Contracts and the US-Moderna contracts," D. 70 ¶ 37, the amended complaint does not identify an actual claim.  Although it is not necessary to do so to satisfy the pleading requirements of Rule 9(b) where a defendant is alleged to have caused the submission of false claims, as discussed above, this does not release a relator from the necessity of asserting falsity on a theory of implied certification from Escobar's requirement to allege "specific representations about the goods and services provided." Escobar, 579 U.S. at 190.  None are alleged in the amended complaint.[4]

_____

[4] Stonebrook has included in his opposition an image of what he purports to be "Pfizer's first invoice for payment for the COVID-19 vaccine." D. 89 at 10–11.  Stonebrook urges the Court to take judicial notice of this invoice as an official public record because it was an exhibit filed in another case. Id. (citing United States ex rel. Jackson v. Ventavia Rsch. Grp. LLC, No. 1:21-cv-00008-MJT (E.D. Tex. Apr. 22, 2022), D. 37-2).  The Court declines to take judicial notice of the invoice proffered in Stonebrook's opposition. D. 89 at 11; see Giardiello v. Marcus, Errico, Emmer & Brooks, P.C., 261 F. Supp. 3d 86, 89–90 (D. Mass. 2017) (explaining that although "the Court may take judicial notice of court records and judicial proceedings under some circumstances, such as to confirm the fact of filing, it may not do so in order to discern the truth of the facts

Assuming *arguendo* that such specific representations are not always necessary under Escobar, Stonebrook's theory of implied false certification rests upon allegations that overstate Pfizer and Moderna's GMP compliance obligations as set forth in the four contracts incorporated by reference into the amended complaint. Stonebrook alleges, for example, that Pfizer's contracts with the Army required GMP compliance as to all components used in the Covid-19 vaccines because of phrases in the agreements such as "GMP manufacturing," "GMP production," "GMP Covid-19 pandemic supply of RNA-based Covid-19 vaccine on US soil," and to "ensure conformity with § 501(a)(2)(B) of the Food, Drug, and Cosmetic Act (FD&C Act, Title 21 United States Code ('U.S.C.') § 351(a)(2)(B)), regarding good manufacturing practices ('GMP')." D. 70 ¶ 29. But these conclusory allegations are belied by the actual provisions of the contracts. See In re Fidelity Erisa Fee Litig., 990 F.3d 50, 53–54 (1st Cir. 2021) (noting that "[w]hen a complaint expressly cites and relies upon a written contract in support of a claim, the drafter of the complaint cannot prevent the court from considering the written contract in ruling on a motion under Rule 12(b)(6)"). For instance, although Stonebrook asserts that both Pfizer contracts cited in the amended complaint, D. 70 ¶ 29 n.11, required GMP compliance, Stonebrook cites only language from one of the Pfizer contracts. See Pfizer-Army Contract #1. Moreover, it appears that none of the provisions relied upon by Stonebrook specifically indicate that Pfizer was required to ensure immediate GMP compliance of all components to the extent alleged in the amended complaint,

---

asserted within that filing"). Even if it did, however, this document would not alter the Court's analysis of the plausibility of Stonebrook's allegations as to falsity for at least two reasons. First, a single invoice submitted by Pfizer bears no relevance to the alleged falsity of claims submitted by Moderna. Second, Pfizer submitted the proffered invoice on December 31, 2020, the date when any allegedly false certification would have been made. D. 89 at 11. The submission of this claim therefore precedes Stonebrook's employment at the Facility, D. 70 ¶ 18; because Stonebrook's theory of falsity ultimately traces back to conditions he observed during his employment, the Pfizer invoice does not support the plausibility of his allegations as to falsity.

that is, at the supplier level.  See id. at 7 (requiring Pfizer to "supply incremental resources to transfer/implement . . . GMP manufacturing processes"); id. at 6 (noting that "[w]ith GMP production expected to commence[,]" Pfizer would "validate[ ] the facilities and make[ ] continuous process improvements"); id. (noting that Pfizer would establish "capacity for GMP Covid-19 pandemic supply of the RNA-based COVID-19 vaccine on US soil").  Stonebrook's allegation that the contract required Pfizer to "ensure conformity with . . . good manufacturing practices" is also misleading.  See D. 70 ¶ 29.  This clause appears as part of a paragraph titled "Manufacturing Development Plan," and the obligation imposed on Pfizer is not to ensure perfect GMP compliance but rather to "describe the manufacturing process for the vaccine product to ensure conformity" with the FDCA "regarding good manufacturing practices," so that the government would have the opportunity to review same.  Pfizer-Army Contract #1 at 14.

As to Moderna's contracts with HHS and DoD, Stonebrook relies upon provisions that require "GMP material," "adherence to . . . GMP," and a "plan for addressing areas of non-conformance to FDA regulations for . . . GMP."  D. 70 ¶ 30.  Although Stonebrook incorporates two Moderna contracts by reference into the amended complaint, id. ¶ 30 n.12, he only cites language from one of these contracts and again takes these references to GMP out of context.  None of these cited provisions required Moderna to ensure immediate and perfect GMP compliance among component suppliers.  See Moderna-HHS Contract at 15 (noting that "[s]tability studies" will be undertaken and that these studies will "us[e] . . . GMP material"); id. at 29 (noting that, within 30 calendar days of an FDA audit related to "adherence to . . . GMP," Moderna "shall provide copies of the audit report . . . and a plan for addressing areas of

nonconformance to FDA regulations and guidelines for . . . GMP . . . guidelines as identified in the final audit report").[5]

Because Stonebrook's theory of implied false certification is premised upon allegations that Pfizer and Moderna were contractually required to ensure GMP compliance at the component supplier level, see D. 70 ¶ 37, even though the contractual provisions he relies upon do not require same, the Court cannot conclude that Stonebrook has plausibly alleged a "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements" such that any implied certifications of GMP compliance were "misleading half-truths."  Escobar, 579 U.S. at 190; see United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 701–02 (4th Cir. 2014) (holding that a relator failed to allege plausibly falsity stemming from noncompliance with GMPs because Medicare and Medicaid do not require GMP compliance as a precondition to reimbursement).

      b)     <u>Materiality</u>

Even assuming *arguendo* that Pfizer and Moderna's contracts with the government required GMP compliance as alleged in the amended complaint, Stonebrook has not plausibly alleged materiality.  The FCA defines material to mean "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

---

[5] Moderna's contract for the manufacture of 500 million vaccine doses includes specific language as to the "base period" of production, which requires "cGMP manufacturing of 100 million doses fully compliant with 21 CFR 210 and 211."  Moderna-DoD Contract at 3. Stonebrook does not cite this language in the amended complaint, however, and even assuming *arguendo* that the inclusion of any adulterated HEPES or TRIS from the Facility would have rendered Moderna's claims for these 100 million vaccines "false," Stonebrook has alleged no facts regarding Defendants' allegedly false statements to Moderna regarding same or connecting the alleged GMP violations to the submission of false claims to the government.

"[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  Escobar, 579 U.S. at 193 (internal quotation marks and citation omitted).

As explained in Escobar, 579 U.S. at 194, "[t]he materiality standard is demanding."  "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations."  Id. (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)).  "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  Id. at 194.  "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  Id.  "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial."  Id.

Escobar explained that "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.  Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  Id. at 194–95.

Here, Stonebrook's conclusory allegations as to materiality do not pass the pleading standard.  See D. 70 ¶ 37 (alleging that "[t]he false claims – by way of the implied certification of compliance with GMP requirements delineated in the US-Pfizer Contracts and the US-Moderna Contracts – were material to the U.S. government's decision to purchase the Covid-19 vaccines

for the pandemic"); id. ¶ 94 (alleging that "misrepresentations that pharmaceutical components were manufactured and packaged in a clean, safe, and non-contaminated environment are material to payment").  Nowhere in the amended complaint does Stonebrook allege that the government refused to pay Pfizer or Moderna due to GMP noncompliance for the components of their drugs or otherwise.  See Escobar, 579 U.S. at 195.

Even if the Pfizer and Moderna contracts could be construed to require the degree of GMP compliance contemplated by Stonebrook, the amended complaint does not identify any language in the contracts suggesting that a deviation from GMPs in the vaccine supply chain—and prior to Pfizer or Moderna's purchase of components—would impact the government's payment decision. Indeed, by their own terms, the contracts promote GMP compliance by requiring Pfizer and Moderna to prepare manufacturing development plans for the government's review, to report any compliance issues identified by the FDA, and to implement a plan to address any noncompliance. See, e.g., Pfizer-Army Contract #1 at 14 (requiring Pfizer to prepare a manufacturing development plan to ensure compliance with GMPs); Moderna-HHS Contract at 30 (requiring Moderna to report GMP compliance issues arising from an FDA inspection and make "a plan for addressing areas of nonconformance, if any are identified").  This approach reflects the government's stated objectives to both ensure the safety and efficacy of the Covid-19 vaccine and also scale up production capabilities expeditiously in the midst of a worldwide, public health crisis.  See, e.g., Pfizer-Army Contract #1 at 2 (emphasizing that the "quick scale up of production" is "critical for bringing a COVID-19 vaccine to market to address this urgent medical need while preserving high quality and safety standards").  If some GMP noncompliance at a single plant in the vaccine supply chain would have led the government to cancel the contract, it makes little sense why the contracts themselves would omit such critical language and instead afford some opportunity to address areas

of noncompliance.  See Moderna-HHS Contract at 30.  It is also significant that these contracts recognize the FDA's enforcement authority as to GMP compliance and yet the amended complaint, while alleging that Stonebrook reported his concerns to the FDA, D. 70 ¶ 75, is devoid of any indication that the FDA subsequently audited the Facility and found GMP violations.  See, e.g., Pfizer-Army Contract #1 at 16 (noting that "the Government will have no right to withhold payment in respect of any delivered dose, unless the FDA has withdrawn approval or authorization of the vaccine").  For at least these reasons, Stonebrook's allegations have not met the "demanding standard" of materiality.  Escobar, 579 U.S. at 194–95.

c)      Scienter

The amended complaint also fails to state a claim because Stonebrook has not plausibly alleged scienter.  The FCA provides that "[a] person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'"  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 380 (1st Cir. 2011) (quoting 31 U.S.C. § 3729(b)).  Because Stonebrook has not adequately alleged falsity, as discussed above, he cannot plausibly allege that Defendants knew the omission of the alleged GMP noncompliance would render Pfizer and Moderna's claims for payment false.  Moreover, the lack of requirement of GMP compliance for components of Pfizer and Moderna drugs under the publicly available portions of their government contracts also belies any plausible allegation of actual knowledge of the alleged falsity of any claims that these manufacturers submitted to the government (or any deliberate ignorance or reckless disregard of same).  Accordingly, Stonebrook has not adequately pled scienter.  Thus, the Court dismisses Counts I and II.

2.      *"Reverse False Claims" (Count III)*

Based upon the same allegations underlying Counts I and II, Stonebrook alleges a violation of the FCA's "reverse false claims" clause.  See 31 U.S.C. § 3729(a)(1)(G).  Section 3729(a)(1)(G) imposes liability (1) when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or (2) when a person "knowingly conceals or knowingly avoids or decreases an obligation to pay or transmit money or property to the Government."  Id.; see United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc., No. CV 15-13065-PBS, 2018 WL 4539684, at *5 (D. Mass. Sept. 21, 2018).  The FCA defines an "obligation" as "an established duty, whether fixed or not, arising from . . . the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

As some courts have noted, reverse-FCA liability cannot "be premised solely on the same conduct that gives rise to traditional presentment or false-statement claims."  See, e.g., Martino-Fleming, 2018 WL 4539684, at *6.  Stonebrook's theory of reverse false claims is premised on the same allegations underlying Counts I and II.  See D. 70 ¶ 123 (alleging that "Defendants recognized that it had caused, adulterated, and misbranded drugs to enter interstate commerce" and that "Defendants took no action to repay or refund its customers or the United States despite knowledge that Defendants had fraudulently induced the purchase of adulterated and misbranded drugs").  As such, the Court also dismisses Count III.

## C.      Stonebrook Has Not Plausibly Alleged an FCA Retaliation Under Rule 12(b)(6)

Defendants argue that Stonebrook has failed to state an FCA retaliation claim pursuant to 31 U.S.C. § 3730(h)(1).  "[T]he FCA bars an employer from retaliating against an employee 'because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA].'"  Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019)

(alteration in original) (quoting 31 U.S.C. § 3730(h)(1)).  "To prevail on an FCA retaliation claim, 'a plaintiff must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct."  <u>Id.</u> 187–88 (quoting <u>Karvelas</u>, 360 F.3d at 235).  Defendants contest the first and third of these elements. D. 85 at 35.

### 1.    Protected Conduct

To plausibly allege protected conduct, the First Circuit has held that "a plaintiff must sufficiently plead that he or she was retaliated against based on 'conduct that reasonably could lead to a viable FCA action.'"  <u>Id.</u> at 188 (quoting <u>Karvelas</u>, 360 F.3d at 236).  "Conduct" under the FCA includes an employee's "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government."  <u>Id.</u> (citation omitted).

Stonebrook has alleged investigations and inquiries into GMP noncompliance at the Facility.  <u>See, e.g.,</u> D. 70 ¶ 63 (alleging that Stonebrook emailed Defendants' executives regarding GMP violations at the Facility); <u>id.</u> ¶ 66 (alleging that Stonebrook submitted an internal report via Defendants' internal compliance reporting system concerning GMP violations).  Moreover, some of these complaints include cursory reference to the FCA.  <u>See, e.g.,</u> <u>id.</u> ¶ 66 (including in the subject line of an internal report "Violations of the False Claims Act").  Having reviewed the amended complaint in its entirety, however, the thrust of Stonebrook's investigations did not "concern" the "knowing submission of false or fraudulent claims for payment to the government" but instead centered on the alleged GMP violations.  <u>See</u> <u>Guilfoile</u>, 913 F.3d at 188.  Regulatory noncompliance, without more, does not give rise to a viable FCA action.  <u>See</u> <u>Escobar</u>, 579 U.S.

at 194 (emphasizing that the FCA is not a "vehicle for punishing garden-variety . . . regulatory violations"); see also Rostholder, 745 F.3d at 702 (affirming dismissal of relator's case and noting that if the court were "to accept relator's theory of liability based merely on a regulatory violation, [it] would sanction use of the FCA as a sweeping mechanism to promote regulatory compliance, rather than a set of statutes aimed at protecting the financial resources of the government from the consequences of fraudulent conduct"); United States ex rel. Crocano v. Trividia Health Inc., 615 F. Supp. 3d 1296, 1301 (S.D. Fl. 2022) (allowing motion to dismiss relator's case and noting that the FCA "is not a catch-all statute targeting any conceivable form of misconduct connected with the government's spending programs—particularly when such misconduct is proscribed by separate enforcement regimes"). The same in the context of an FCA retaliation claim. See, e.g., Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 187–88 (3d Cir. 2001) (affirming dismissal of claims and holding that "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is not protected conduct) (quoting United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998)); Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 914 (4th Cir. 1997) (affirming summary judgment for defendants and noting that a relator "[s]imply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [the relator] was acting 'in furtherance of' a qui tam action"). And as the Court has already discussed at length, the Pfizer and Moderna contracts do not include language mandating GMP compliance to the extent alleged in the complaint for the submission of their claims to the government. Thus, to the extent Stonebrook references the existence of federal contracts or speculates as to the possibility of FCA liability, his investigation or inquiry into same reasonably could not have led to a viable FCA action. See Karvelas, 360 F.3d at 236-37; Guilfoile, 913 F.3d at 188. For these reasons, the Court

concludes that Stonebrook has not plausibly alleged the "protected conduct" element of an FCA retaliation claim.[6]

For these reasons, dismissal of Stonebrook's FCA retaliation claim is also warranted.

## VII.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss.[7]  D. 84.

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

[6] Since he has failed to plausibly allege this requisite element of this FCA retaliation claim, the Court need not reach Defendants' challenge to the third element of this claim.

[7] Since the Court allows Defendants' motion to dismiss pursuant to Rules 9(b) and 12(b)(6), the Court does not reach their argument that amended complaint should be dismissed as to MKDG under Rule 12(b)(5).